**Larry E. CLARK and J. Elliott Knoll, Plaintiffs-Appellants,**

v.

**UNITED BANK OF DENVER NATIONAL ASSOCIATION, a national banking association, et al., Defendants-Appellees.**

No. 72-1047.

United States Court of Appeals, Tenth Circuit.

May 22, 1973.

---

12. United States v. Hill, 469 F.2d 673 (10th Cir. 1972).

13. United States v. Gibson, 446 F.2d 719 (10th Cir. 1971).

Theodore M. Smith, Denver, Colo. (William E. Myrick, Denver, Colo., on the brief), for plaintiffs-appellants.

Donald C. McKinlay, Denver, Colo. (Paul A. Jacobs, Denver, Colo., on the brief), for defendants-appellees United Bank of Denver National Association and United Banks of Colo., Inc.

Before HILL, SETH and BARRETT, Circuit Judges.

HILL, Circuit Judge.

Appellants Clark and Knoll appeal from an order granting defendants' motion for summary judgment entered by the United States District Court for the District of Colorado. Appellants assert error by the trial court on three grounds: They contend their action was properly brought on an allegation of fraud in connection with the purchase or sale of a security; that the complaint contained allegations that the denial of their loan was done in furtherance of appellees' intention to establish a monopoly, therefore the antitrust claims were properly stated; and, they challenge the use of summary judgment in an antitrust case.

Clark and Knoll became interested in acquiring The Poudre Valley National Bank (Poudre) in Fort Collins, Colorado. In search of financing with which to acquire approximately 81 percent of the capital stock of Poudre, appellants went to appellee United Bank of Denver National Association (United), a subsidiary of United Banks of Colorado, Inc. (Holding Company), a national bank holding company. The Holding Company had previously declined purchase of the stock in question due to doubts as to the approval of such acquisition by the

Federal Reserve Board. Appellants' loan application was refused by United following a period of negotiation. During the negotiation process, the Federal Reserve Board altered its policy, and it was eventually thought by the officers of the Holding Company that approval by the Federal Reserve Board could be obtained for its acquisition of the stock of Poudre. Negotiations by the Holding Company to acquire control of Poudre were initiated but were soon abandoned upon learning from the owner of the stock that other negotiations were being conducted for the stock. When these other negotiations terminated, the Holding Company was contacted by the owner and it ultimately purchased Poudre as another subsidiary. Roger Knight, Jr., is chairman of the board of United and president of the Holding Company. Norman Dean is a director of the Holding Company and executive officer of another United Bank owned by the Holding Company. We have distinguished the roles of the Holding Company in the events preceding the filing of the complaint; however, in resolution of the issues raised in this appeal, we have considered the Holding Company and its wholly-owned subsidiary, United, as a single entity.

The basic premise of the action was that the Holding Company had negotiated for the purchase of Poudre while United was contemporaneously negotiating with Clark and Knoll on their loan application to purchase the stock, without disclosing this fact to them. In addition to alleging breach of fiduciary duties, fraud, unfair competition, and breach of warranty, the complaint also alleged fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and Rule 10(b)–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5. Clark and Knoll, in their complaint, also alleged violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2 and 18.

The Securities Exchange Act of 1934, § 10(b), makes unlawful the use of any manipulative or deceptive device or contrivance in connection with the purchase or sale of any registered security. Rule 10(b)–5 further delineates the proscribed offense.[1] Relying on the language contained in the statute, Clark and Knoll maintain that the loan which they sought from United was for the purpose of purchasing the Poudre stock; that it was fraudulent for United to conceal or fail to disclose the Holding Company's interest in acquiring the Poudre stock while United was negotiating the loan with Clark and Knoll; and that therefore, within the broad terms of the statute, there was fraud in connection with the purchase or sale of a security.

In Knauff v. Utah Construction & Mining Co., 408 F.2d 958 (10th Cir. 1969), cert. denied, 396 U.S. 831, 90 S. Ct. 83, 24 L.Ed.2d 81, this Court stated at 961 that "[t]he words 'purchase or sale' must be defined broadly." We there held the term "purchase or sale" to "include the exchange of shares which occurs as the result of a merger." In that case we were aided by a tangible event involving the actual transfer of shares of stock. In this case there is no such tangible event. No stock was purchased or sold by Clark and Knoll. To construe loan negotiations for the purpose of purchasing stock to be "in connection with the purchase or sale of any security" would be an overly broad ex-

---

1. 17 C.F.R. § 240.10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a ma-

terial fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

tension of that term. Therefore, we reject the claimed application of the Securities Exchange Act to this transaction.

 Appellants advance three arguments in support of the alleged antitrust violations. The first involves an allegation of tying associated with approval of the loan. During the loan negotiations, United received from Clark and Knoll an oral promise to maintain an interest-free deposit in United of at least $1,500,000 in the event the loan was made. In this manner United's position as correspondent bank would be established. Clark and Knoll contend this condition of the proposed loan agreement, that is, to maintain the substantial interest-free deposit, is a tying arrangement and a *per se* violation of the Sherman Act. We are first confronted by the failure of appellants to demonstrate the requisite market power over the tying product.[2] The Bank Holding Company Act Amendments of 1970, particularly § 106(b), 12 U.S.C. § 1972, prohibits certain types of tying arrangements within the banking industry. The legislative history, however, indicates that the provision was not intended to interfere with the conduct of appropriate traditional banking practices. Included in these excepted banking practices was the maintenance of traditional correspondent relationships. In light of this, we cannot conclude that such a requirement by United would be a *per se* violation as a prohibited tying arrangement. Also important in connection with this argument is the fact the complained about tying arrangement never became a part of a final agreement. It was only discussed and considered as a part of the negotiating process. In fact, in the extensive depositions the evidence is entirely lacking to show even that loan negotiations ever reached the point

of a formal written application for a loan by appellants. Nor is there any evidence of an oral agreement between the parties concerning even any phase of a loan agreement. In fact, there were only conversations had between appellants and officers of Holding Company concerning the possibility of a loan.

 The next argument advanced in support of the antitrust claims alleged in the amended complaint involves an alleged refusal to deal. Depositions which the trial court considered in making its decision clearly demonstrate that United had ample and valid reason to refuse the loan based on appellants' failure to obtain adequate financial resources and their lack of adequate managerial qualifications in the area of financial institutions. There is nothing in the record considered by the trial court which would indicate the refusal by United was prompted by any other reason. Also, we find no relevant evidence which might even indicate or infer United's denial of the loan was motivated by a desire on its part to further monopolize the relevant market.[3] Again, we find no evidence in the extensive depositions and record sufficient to even infer a monopoly position with regard to a loan of this amount, nor that in denying the loan United did so out of a desire to further monopolize the relevant market. Such a showing is prerequisite to an asserted refusal to deal claim.

 The third antitrust claim advanced by appellants is that of attempt to monopolize. In this context they urge that United's acquisition of Poudre would give it 35 percent of the total assets of the area. The relevant facts are that Fort Collins, Colorado, a city located about 65 miles north of Denver, was serviced by four banks. The largest bank was The First National Bank of

---

2. Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

3. "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trad-

er or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

Fort Collins which was owned by Western Bancorporation, Inc., a California-based holding company. In 1967 this bank held approximately 57 percent of the area's deposits. The Poudre bank was second largest, having approximately 35 percent of the area's deposits, and was owned by Flour Mills of America, Inc. prior to its acquisition by the Holding Company. The two smaller banks divided the remainder of the area's banking deposits substantially equally. The Holding Company of which United was a subsidiary did not at that time have any substantial banking contacts in Fort Collins. Its closest subsidiary bank was located at Greeley, Colorado, 30 miles southeast of Fort Collins.

Also in resolving this question the type of merger which would result from the acquisition of Poudre by the Holding Company has considerable importance. In United States v. First National Bank, 301 F.Supp. 1161 (S.D.Miss.1969), five recognized types of mergers are defined and described. The fourth of these five types is "a 'geographic market extension merger' which is a merger between two firms that produce the same product line but do so in separate geographic markets and are not direct rivals." United States v. First National Bank, *supra* at 1190. In further describing this type of merger the court stated, "The geographic market extension merger does not alter the number of competitors that are in the relevant market or their specific locations and the same number of banking alternatives exist after the merger as before. Therefore, the present restraint upon undue use of market power which exists in this market is going to continue to exist for some time after this proposed merger. . . ." Id. The acquisition of Poudre by the Holding Company clearly would be within this definition and would be governed by antitrust factors relevant to this type of merger.

Market shares propounded by appellants are relevant only in horizontal mergers,[4] that is, "a merger between two firms who are in direct competition, that is, producing the same product lines and operating in the same geographic markets." United States v. First Nat'l Bank, *supra*. In a geographic market extension merger, our consideration of anticompetitive effect is limited "to an evaluation of whether it has the effect of removing a *potential market entrant* and to a consideration whether [the merging bank], which is not yet in the market, may still be a present competitive force, the presence of which deters ologopolistic practices, whereby its merger with a member of that market may eliminate competition in much the same way that a simple horizontal merger can."[5] United States v. First Nattional Bancorporation, Inc., 329 F.Supp. 1003, 1011 (D.C.Colo.1971), aff'd per curiam by an equally divided Court without opinion, 410 U.S. 577, 93 S.Ct. 1434, 35 L.Ed.2d 507 (1973).

There appear to be three potential routes of influx into a geographic area by a potential market entrant bank or bank holding company: The first is to establish a bank *de novo*, that is, create a new bank as a subsidiary following approval by the regulatory agencies. The second method is to develop competition within a geographic area from a present

---

4. United States v. Phillipsburg Nat'l Bank, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970) ; United States v. Third Nat'l Bank, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968) ; United States v. First Nat'l Bank & Trust Co., 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964) ; United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) ; United States v. Provident Nat'l Bank, 280 F.Supp. 1 (E.D.Pa. 1968) ; United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y.1965).

5. *See also* United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) ; United States v. Idaho First Nat'l Bank, 315 F.Supp. 261 (D.C.Idaho 1970) ; United States v. First Nat'l Bank, 310 F.Supp. 157 (D.C.Md. 1970) ; United States v. First Nat'l Bank, 301 F.Supp. 1161 (S.D.Miss.1969) ; United States v. Crocker-Anglo Nat'l Bank, 277 F.Supp. 133 (N.D.Cal.1967).

banking location by building closer commercial relationships within that area. The third alternative available to the potential entrant is establishment of a branch bank. In a deposition exhibit, the Board of Governors of the Federal Reserve Board, in a statement as part of its order approving the Holding Company's acquisition of the Poudre stock, determined the banking needs of the community appeared to be adequately served by the four banks located there, and also that the development of closer commercial relationships between Fort Collins and Greeley, the site of the Holding Company's closest subsidiary bank, appeared unlikely due to the existing highway structure in the intermediate area. The third potential route of influx, that of establishing a branch bank, is not available to appellees due to statutory prohibition.[6] In addition to these objective factors which make the Holding Company's influx into the Fort Collins area impractical, the internal documents of the Holding Company consistently show their intention to enter the Fort Collins banking market only by acquiring an existing bank as a subsidiary.

Appellants lastly challenge the use of summary judgment in an action involving antitrust allegations. While it is true that summary judgment is not favored in antitrust cases,[7] we feel, in view of the extensive depositions and deposition exhibits available to the trial court,[8] that summary judgment was proper in this situation.

In view of our disposition of this case, we make no determination of appellees' challenge that Clark and Knoll lack standing to assert a potential competition claim.

The trial court's order of summary judgment and dismissal is affirmed.

6. *See* 12 U.S.C. § 36(c) ; 1963 C.R.S. § 14–3–1.

7. Semke v. Enid Automobile Dealers Association, 456 F.2d 1361 (10th Cir. 1972) ; Food Basket, Inc. v. Albertson's, Inc., 383 F.2d 785 (10th Cir. 1967).

8. Depositions available to the court included those of both Clark and Knoll, Roger D. Knight, Jr., Norman M. Dean, Kent Olin, a loan officer of United Bank of Denver, and Jack N. Greenman, the president of Flour Mills of America, Inc.